UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JEFFREY S. SMITH and<br>KATHRYN N. SMITH,<br><br>       Plaintiffs,<br><br>  vs.<br><br>SUSAN E. HEARN,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)   CAUSE NO. 3:18-CV-561-PPS<br>)<br>)<br>)<br>) |

# **OPINION AND ORDER**

This case involves the disclosure (or lack thereof) of past flooding and water damage to a lake house on Oswego Lake that the Smiths purchased from Defendant, Susan Hearn. Trial is set for March 29, 2021. Hearn has moved to exclude or limit the proposed expert testimony of five of the Smiths' experts. [DE 106.] For the reasons set forth below, this testimony fits the admissibility parameters set forth by Federal Rule of Evidence 702 and *Daubert*. Therefore, the motion will be denied.

## **Background**

The facts of this case have already been summarized at length in my opinion denying the cross motions for summary judgment, so they won't be repeated here. [DE 85.] This motion seeks to bar or limit the testimony of five of the proposed experts the Smiths have disclosed under Federal Rule of Civil Procedure 26(a)(2)(b): Doug Harvey (a builder who works for Coplen Construction); Jason Ganser (an industrial and environmental consultant) who works at ACM Engineering & Environmental Services

with Patrick Griffin (an engineer); and Rick Keller who works at Keller Engineering along with Patrick O'Toole.

## Discussion

Federal Rule of Evidence 702, which governs expert testimony, provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702.  In addition, in *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court fashioned a two-prong test of admissibility for expert evidence.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).  To be admissible, evidence must be both relevant and reliable.  *Id.* at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting the objective of court's gatekeeping requirement is to ensure reliability and relevancy of expert testimony); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (trial judges act as gatekeepers to screen expert evidence for relevance and reliability).

In performing this gatekeeping role, I must determine: (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to

determine a fact in issue." *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted). The proponent of the expert's testimony bears the burden of demonstrating the testimony satisfies the *Daubert* standard by a preponderance of the evidence. *See Gopolratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017). Also noteworthy is the fact that "[t]he rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *See Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 372 .Supp.2d 1104, 1110 (N.D. Ill. 2005) (quotation omitted).

**I.     Harvey**

Harvey is a part owner and an officer of Coplen Construction, Inc., which is a general contractor that specializes in residential and light commercial construction. [Harvey Dep., DE 107-1 at 8.] Harvey has been with the company for approximately 35 years. [*Id.* at 9.] He has performed work on a number of lake houses over the years, including the one at issue in this case. [*Id.* at 9-10.] Harvey is therefore both a fact witness and an expert witness in this case. Harvey inspected the house in the Spring of 2012, at Hearn's request, to determine what work was required to repair damage from water intrusion. [*Id.* at 10, 11-13, 19-22.] When Harvey was at the home, he saw water damage, and Hearn was wearing rubber boots, moving things out of the home. [*Id.* at 16, 20.] While there, Harvey physically fell through the wet floor and pointed out black mold to Hearn. [*Id.* at 21, 25.] Later in 2012, Hearn had Harvey place a temporary floor over the top of the existing floor. [*Id.* at 26.] In September 2012, Harvey supplied Hearn

with a proposal to repair the home, including mold mitigation. [*Id.* at 32-33.] Harvey ultimately explained that he was not interested in remodeling the home because he thought it was cost prohibitive to do the required repairs, and he believed the home was set too low. [*Id.* at 39-40.]

Hearn attacks two statements that Harvey made during his deposition and seeks to bar them from trial. The first is that Harvey told Hearn the home needs to be torn down and rebuilt because the house is too low in the flood plain and would likely flood again. [Harvey Dep. at 23-24.] The second statement was made when Harvey told Hearn he observed mold in the kitchen and by the fireplace, and he told her that "chances are it's [the mold] throughout the home underneath this area that we could not see." [*Id.* at 77-78] During the deposition, when asked if he ever expressed an opinion to Hearn about how significant the mold problem might be, Harvey responded yes, he told Hearn the damage was significant enough that Harvey suggested the home be torn down and a new structure put in its place. [*Id.*] Harvey told Hearn even if he made the proposed repairs, it would not fix the problem because mold would still flourish, and there was no way to fix the sill plates, which would continue to get worse. [*Id.* at 77.]

Notably, Hearn does not question Harvey's expert report on the cost to replace the home and she does not question Harvey's qualifications as an expert witness.[1]

---

[1] Neither party has provided the court with a copy of Harvey's curriculum vitae or his expert report.

Rather, she has cherry picked two statements Harvey made during his deposition, and then concludes that "all proffered expert opinions of Harvey should be excluded." [DE 107 at 9.] With all due respect, this is not how a *Daubert* motion works.

As to the first statement, Hearn argues Harvey's testimony that the house needed to be torn down and built above the 100 year flood plain because it would likely flood again "adds nothing to what a lay juror could conclude from the evidence about flooding in the house." [DE 107 at 7.] While it is true that an expert's testimony is admissible only when it provides "something more than what is obvious to the layperson in order to be of any particular assistance to the jury," in this case, I think this statement plainly *does* assist the jury. *Dhillion v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). Harvey's testimony on this topic absolutely would help a juror evaluate what level of knowledge Hearn possessed about the state of the house before she completed the real estate disclosure form. Plus, a juror would not likely have common knowledge about the extent of repairs and expenses due to flooding of a house.

Hearn criticizes Harvey's statement that the house should be torn down and built above the flood plain, arguing it is not based on a scientific methodology or any technical basis. However, Harvey supported his suggestion that the home be torn down for a number of reasons, including the damage to the plates supporting the walls of the home could not be fixed, and would continue to get worse. [Harvey Dep. at 77.] This opinion is based upon Harvey's 35 years of experience in the construction field (and specifically, dealing with lake houses), as well as his visual inspection of Hearn's

5

house, which satisfies the reliability prong. *See Trustees of Chicago Painters and Decorators Pension v. Royal Int'l Drywall and Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (confirming that Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience.").

This is not the type of "curbside opinion" excluded in *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993), where the expert testified: "What I'm giving you now is kind of a curb side opinion. If . . . you were asking me to give you an analytical, scientific opinion, then, I would have to research it, and I have neither the time nor the inclination to do that." In this case, Harvey was personally in the house multiple times, and he was qualified to give his opinions based upon his own observations and experience.

Not only is this testimony helpful to the jury, but it is also highly relevant. If Hearn was told that the house needed to be torn down due to water and mold damage, this could directly bear on the fraud claim. For example, it could contradict a suggestion that Hearn was unaware of the scope of the water damage.

The second statement made by Harvey in his deposition and challenged by Hearn is his remark that when he saw mold in the kitchen and the fireplace, he stated that it likely exists throughout the home. Again, this assertion is based upon Harvey's years of experience as a contractor dealing with home repairs, remodeling, and water damage, and I see nothing wrong with him stating this opinion. It is up to the jury to be

6

the essential arbiter of the weight and credibility of such testimony. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013).

In a nutshell, Hearn's objections to Harvey's testimony are more of a challenge to the weight to be afforded a few statements he made during his deposition, rather than the admissibility of his expert opinion. Of course Hearn will have the opportunity to challenge Harvey's opinions at trial, and the jury will then be allowed to give the testimony whatever weight it deems appropriate.

One last thing about Harvey. Because Harvey is both a fact witness and an expert witness, plaintiffs will need to structure his examination to make it clear when he is testifying as a fact witness and when he is putting on his expert hat and giving opinions. The Seventh Circuit has made clear that this is necessary so the jury can be instructed on how to evaluate Harvey's testimony as a fact witness on the one hand, and as an expert, on the other. *See e.g. United States v. Christian*, 673 F.3d 702, 712-14 (7th Cir. 2012); Fed. R. Evid. 701, 702.

II.   **Ganser and Griffin**

Ganser is an environmental and industrial consultant with ACM Engineering & Environmental Services. He works with Griffin, an engineer, also at ACM. On January 22, 2019, about eleven months after the flood which occurred after the Smiths purchased the house, Ganser and Griffin conducted an examination of the house. Their analysis consisted of five parts: (1) a visual examination; (2) tape lifts; (3) moisture content

7

mapping; (4) relative humidity and temperature monitoring; and (5) taking photographs. [Ganser Dep., DE 107-2, at 8-12.]

Ganser authored the ACM report which is attached for the court as an exhibit. [ACM Report, DE 110-1.] The report sets forth the testing protocols and assessment procedures, including visual inspection, optical surface tape lift samples for mold spore and structure identification, moisture content mapping, and relative humidity and temperature monitoring. [ACM Report at 3-5.] Some of the findings in the ACM report include: "[v]isual observations and the results of the optical surface tape lift samples collected . . . indicate that mold growth is present on various building materials in multiple locations throughout the structure"; "[t]hirteen (13) of the fifteen (15) optical surface tape lift samples . . . contained the positive identification of mold spores and structures in their results"; "[v]isual observations indicate that multiple sources of suspect mold growth are present within the residence"; and "[m]oisture content mapping performed during the assessment did identify the presence of elevated concentrations of moisture capable of promoting the development and proliferation of mold growth on building materials located in the residence." [*Id.* at 7.] Additionally, the report concludes that mold growth and damage was due to "[c]hronic and reoccurring large scale flooding water intrusion events." [*Id.* at 23.]

Two tools were used by Ganser in connection with the inspection and report: a GE Protimeter moisture meter (which measures the moisture content within building materials) and a hygrometer (which reads relative humidity levels and temperature).

[Ganser Dep. at 16, 44-46.] Ganser explained in his deposition how these tools work, his familiarity with them (he has been using a GE Protimeter moisture meter for 18 years, often on a daily basis), how the machines are calibrated, and how the tests are conducted. [*Id.* at 18-19, 30, 32, 38-39, 46, 70.]

In her reply, Hearn clarifies that she is attacking the testimony of Ganser and Griffin "that simply regurgitates the readings from the devices" and the tape lifts, because it is not a "considered opinion" in line with Rule 702. [DE 112 at 3.] This argument is perplexing. Regarding the tape lifts, Ganser administered the tape lifts, the slides were then transported to ACM's accredited lab where they were analyzed for the existence of mold, Ganser documented the chain of custody in his report, and he then reviewed the results. [Ganser Dep. at 69-70, ACM Report at 25.] Ganser also supplied a detailed analysis of the mold growth and the different kinds of mold. [ACM Report at 25-30.] Regarding the moisture meter and hygrometer, again, Ganser used these devices in the home and confirmed the moisture levels and humidity were conducive to mold growth. [*Id.* at 21-22.]

Ganser is not merely repeating or regurgitating data. He is explaining how he used scientific instruments, how the tests work, and how he interprets the test results. That absolutely complies with the scientific method prescribed by *Daubert*. His testimony is reliable, and necessary. What juror could possibly understand the measurements of a GE Protimeter moisture meter, hygrometer, and mold tape lifts, without an explanation?

To the extent Hearn has a beef with Ganser because he cannot exactly pinpoint the date of the "moisture events" from looking at the mold growth and moisture readings in the house, that does not mean his entire expert opinion should be thrown out. Rather, Hearn is free to cross-examine him on this point at trial. *See Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Additionally, Ganser did set forth how he came to the conclusion that the conditions he observed and tested are the result of chronic and recurring flooding events with the water originating from the exterior. [Ganser Dep. at 40-43, 58, 71.] His opinions are both relevant and reliable; and therefore, admissible.

### III.   Keller and O'Toole

Keller is a civil engineer at Keller Engineering and O'Toole works for him. Recall that the house flooded in February 2018, shortly after the Smiths purchased it. On January 22, 2019, O'Toole inspected the house without Keller present. The purpose of the inspection was to determine if there had been a previous flood, and whether the existing damage was due to the most recent flood or prior floods (when Hearn owned the house). [Keller Report, DE 110-2, at 1.]

Keller and O'Toole both prepared and signed the report for Keller Engineering. [DE 110-2.] Keller and O'Toole offered three main opinions: (1) "[t]he damage to the lower portion of the walls" in the house "was not at all indicative of a flooded house

10

that was wet for two weeks;" (2) "there clearly were repairs made to the house prior to it being opened up last February" meaning the house "had flooded in the past"; and (3) the house should be rebuilt above the level of the 100-year floodplain because the lake will continue to flood and the foundation is sinking. [Keller Dep., DE 107-5, at 34, 36, 65-68; Keller Report at 9.] More than just these conclusions, the report also includes photographs taken by O'Toole (and conditions personally observed by O'Toole at the home).

The Keller report specifically finds: the entryway had moderate fungal growth along the bottom plate; there was advanced damage to the bottom plate and studs in the foyer area and much of the wood was a very dark brown indicating an advanced state of decay; advanced decay in the hallway; extensive rot along all four walls of the garage; the family room had significant decay in the bottom plate, up along the studs, and to the back of the exterior sheathing around the perimeter of the room; the central hall had extensive damage in parts; and the master bedroom and bath had what appeared to be the worst damage, where some parts were completely deteriorated. [Keller Report at 2-6.] The Keller report concludes that the advanced state of decay would not have been expected in the 13-day period since the recent flood; but rather, based on the extensive decay in portions of the house and the fact that there clearly were repairs made to the house previously, "it is our opinion that this house had flooded in the past." [*Id.* at 9.] Keller testified during his deposition that in order for the sill plates and bottom of the studs to decay as much as they saw, that would take

11

several events, probably occurring over a number of years. [Keller Dep. at 24-25.] To the extent Hearn simply disagrees with this opinion, "the key to the [Daubert] gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at [his] opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013).

Hearn takes aim at the "screwdriver test." As can be seen in some photographs in the Keller Report, during the home inspection, O'Toole pressed a screwdriver into the wood in multiple places. The metal portion of the screwdriver sunk into the wood - sometimes all the way up to the handle of the screwdriver. Although Hearn attacks this methodology as not being scientific enough, Keller testified that the screwdriver test was consistent with what he would expect someone in his profession to do, and that no further testing is needed when the screwdriver is pushed and literally goes all the way through the plate without any resistance. [Keller Dep. at 70.] When the screwdriver goes through like that, Keller testified it tells him that "the structural integrity of the sill plate is totally lost, is totally gone." [*Id.*] In such a case, there is no need for further testing because there is no integrity left to the material. [*Id.* at 70, 77.]

Keller and O'Toole are both experienced engineers. Hearn does not dispute their qualifications. Keller has more than 40 years of engineering experience with an emphasis on structural design, and he has consulted on more than 1,200 houses and provided expert testimony in 19 cases. [Keller c.v., DE 107-6.] Although the screwdriver test may seem a bit crude, there is nothing about it that is unscientific,

12

unproven, or unreliable. Plus, pushing a screwdriver through wood was not the only thing Keller and O'Toole based their opinions upon - of course O'Toole inspected the property personally, and took photographs of the damage to the house. Like everything else addressed in this opinion, Hearn may cross-examine Keller and O'Toole on their opinions and the screwdriver test. *See Metavante v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (criticism of quality of testimony goes to weight of expert testimony, not admissibility). But their opinions are both relevant and reliable, and therefore will not be excluded from the jury.

## Conclusion

For the above referenced reasons, Defendant Hearn's Motion to Exclude or Limit Proposed Expert Testimony [DE 106] is **DENIED**.

SO ORDERED.

ENTERED: February 22, 2021.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT